DA 06-0403

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 291

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

LAWRENCE FREDERICK ROEDEL,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 05-357A
Honorable Katherine R. Curtis, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Jim Wheelis, Chief Appellate Defender; Joslyn Hunt, Assistant Appellate
Defender, Helena, Montana

    For Appellee:

        Hon. Mike McGrath, Attorney General; John Paulson, Assistant Attorney
General, Helena, Montana

        Ed Corrigan, Flathead County Attorney; Lori A. Adams, Deputy County
Attorney, Kalispell, Montana

Submitted on Briefs:  September 26, 2007

Decided:  November 6, 2007

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Lawrence Roedel (Roedel) appeals his conviction in the Eleventh Judicial District, Flathead County, for deliberate homicide in violation of § 45-5-102(1), MCA. He also appeals the District Court's decision to admit a tape recording at his sentencing hearing. We affirm.

¶2 We review the following issues on appeal:

¶3 *Does Roedel present a record-based claim of ineffective assistance of counsel regarding his counsel's failure during voir dire to challenge a juror for cause and to move to strike the venire?*

¶4 *Did Roedel's counsel provide ineffective assistance during voir dire by discussing a newspaper article that referred to his counsel as a "liar?"*

¶5 *Did Roedel's counsel provide ineffective assistance by failing to object to certain testimony?*

¶6 *Did the jury have sufficient evidence to convict Roedel?*

¶7 *Did the District Court violate Roedel's right to be present at all critical stages when it did not require Roedel's presence or an express waiver of his presence during the settling of the jury instructions?*

¶8 *Did the District Court err in allowing the State to play a tape recording at the sentencing hearing without first giving Roedel an opportunity to review it?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶9 Roedel called the Lake County Sheriff's Office 911 dispatch at 11:03 p.m. on August 27, 2005. Roedel told the dispatcher, "I think I just shot my wife." Roedel gave his address

2

and pleaded with the dispatcher to get someone quickly to his house. Roedel stated that his wife, Dawn Thompson (Dawn), had come into his room pointing a .357 magnum at his face. He claimed that they were wrestling over the gun when it went off.

¶10 Roedel pounded on the bedroom door of his fifteen year old daughter, Emily Thompson (Emily), while he spoke with the 911 dispatcher. Emily unlocked her door to find her father "freaking out." Roedel repeated "Oh my God, I think she's dead," as he led Emily to her mother. Emily checked Dawn for a pulse and attempted to perform CPR. Emily then spoke with the 911 dispatcher and gave instructions to help officers find the Roedel residence. Emily got off the phone and began flashing the porch light on and off to guide the Sheriff's deputies to the house. Roedel stood in the doorway of the house waiving his arms while Emily flashed the porch light.

¶11 Deputy Mike Carlson arrived at the house at 11:20 p.m. Deputy Carlson found Roedel crying, shirtless, and wearing pajama type pants. Deputy Carlson asked Roedel for the location of the gun, and Roedel stated that he did not remember.

¶12 Roedel led Deputy Carlson through the house and into the garage. Deputy Carlson detected a strong odor of gunpowder upon entering the garage. Roedel directed Deputy Carlson to the stairway at the end of the garage. The stairway rose from the garage floor to a small landing, made a ninety degree turn, and followed the back wall of the garage up to a bedroom. Dawn's body lay on the bottom two stairs. Deputy Carlson checked Dawn and found no pulse.

¶13 Roedel told Deputy Carlson that he and Dawn had argued that evening. Roedel stated that he shot Dawn in the back as she descended the stairs. Deputy Carlson again asked

3

Roedel if he knew the location of the gun. Roedel pointed up the stairs and said "it's up there." Deputy Carlson climbed the stairs and looked into the bedroom. He saw a handgun lying on the bed. Deputy Carlson discovered three bullet holes in the wall above the landing in the middle of the stairs.

¶14 The State charged Roedel with deliberate homicide in violation of § 45-5-102(1), MCA. Roedel pled not guilty and the case proceeded to a jury trial. Roedel's counsel identified a potential juror, Rod Meyers (Meyers), as an employee of the Sheriff's office during voir dire. Roedel's counsel asked Meyers if he could remain impartial despite hearing discussions of Roedel's case at work. Meyers initially stated that he had a feeling of Roedel's guilt based on the officers involved in the case. Meyers subsequently stated that he thought he could be fair and would listen only to the evidence presented at trial. He agreed that the State would have to prove Roedel's guilt and that he could vote not guilty and still return to his work. Roedel's counsel did not seek to remove Meyers for cause. Roedel's counsel ultimately removed Meyers with a peremptory challenge.

¶15 Roedel's counsel asked during voir dire if any panel member had read any material regarding his involvement in the investigations of death penalty cases in California. Roedel's counsel formerly had served as a prosecutor in Alameda County, California, and the investigation concerned his former office's practices in selecting juries for death penalty cases. One panel member indicated that a local paper had published a story concerning Roedel's counsel.

¶16 Roedel's counsel described the basis of the story and stated, "and they called me a liar, and I'm going, well, that's a great deal." This statement prompted a panel member to

4

state, "So tell me your side." Roedel's counsel then gave his account of the story. He stated, "[a]nd I promised to tell the truth, and yeah, we really did it. And everybody got all upset." Roedel's counsel finished by saying, "[m]an, I wish I hadn't said anything, but there you go."

¶17 The State presented two of Roedel's neighbors as witnesses. Karen Kliev (Karen) and her husband, Ray Kliev (Ray), live on the property adjacent to Roedel to the north. The Klievs own the Ferndale Market that sits to the south, on the other side of the Roedel residence. The Klievs testified at trial that they had closed up the Ferndale Market at approximately 10:30 p.m. on the night of the shooting. The Klievs both testified to returning home and assuming their nightly ritual of making tea and watching television.

¶18 The Klievs opened the windows and doors of their house that evening to let in a cool breeze after a warm August day. Ray testified that he opened the French doors off the living room that night. The doors point south toward Roedel's residence. Karen testified that she heard three shots in succession as she and Ray were entering their living room. She testified that immediately on hearing the shots she looked at the clock and noted the time as exactly 11:00 p.m. She described the report of the shots as "bang, bang, bang."

¶19 Ray also heard the shots. Ray told his wife that the shots sounded as though they came from a high-powered handgun. He testified to hearing three shots, each sounding approximately one second apart. Ray testified that he had some familiarity with firearms and felt that a handgun definitely had been fired. Ray testified that the report of the gunshots came from the direction of the Roedel residence. He also testified that he recalled their living room clock displaying a time of a few minutes before 11:00 p.m.

5

¶20 Two other witnesses testified at the trial concerning the gunshots. Barbara Slowik (Slowik) testified that she heard two "pops" at 11:00 p.m. on the night of the shooting. She testified that she and her husband had the television on and were nodding off to sleep when the first "pop" stirred her. Slowik nudged her husband, who was sleeping, and asked him if he had heard the noise. He asked if the noise came from the television. She replied that the noise had not come from the television. Slowik testified that she then heard a second "pop." She testified that she did not hear a third popping noise.

¶21 John Nelson (Nelson) also testified to hearing gunshots on the night of the shooting. Nelson lives in an apartment on the property adjacent to Roedel's residence to the south. Nelson testified that something woke him from sleep around 11:00 p.m. Nelson testified to having familiarity with firearms and stated that he felt the gunshots came from a small caliber handgun. He testified to hearing two shots. Nelson testified that he was not sure he had heard three gunshots. He testified that he may have awakened due to a gunshot and then heard two more. He testified that approximately ten to thirty seconds elapsed between the gunshot reports that he heard.

¶22 Detective Jeanne Landis investigated Dawn's homicide. Detective Landis testified that she arrived at Roedel's residence at 12:14 a.m. and spoke with Roedel. Roedel told Detective Landis, "we were fighting over the gun, it went off, and I shot her in the back." Detective Landis testified that she found the gun used in the shooting on Roedel's bed, with the hammer cocked. Detective Landis found three live cartridges and three spent cartridges in the gun's cylinder. The cocked hammer sat poised to fall on a live round. Detective Landis testified that the State Crime Lab recovered no prints from the weapon.

6

¶23    Roedel told Detective Landis that he kept the gun in the top drawer of the desk next to his bed. Detective Landis found a box of shells in this drawer matching the caliber and manufacturer of the cartridges present in the revolver. The box had six empty slots.

¶24    Detective Landis testified that she observed the three bullet holes in the wall above the landing in the middle of the stairs. Two of the holes revealed that a bullet had passed cleanly through the drywall. Detective Landis testified that the bullet causing the third hole had tumbled before striking the wall. She explained that a bullet tumbles once it strikes and passes through an object. The tumbling bullet remained imbedded in the wall. The State Crime Lab recovered no blood or tissue evidence from the bullet.

¶25    Detective Landis conducted several transcribed follow-up interviews with Roedel at his request. Detective Landis testified that Roedel stated in his initial interview that Dawn had fired the first two shots. She testified that Roedel changed his story and later stated that he had fired the first shot. Detective Landis testified that Roedel subsequently admitted to firing the gun all three times.

¶26    Travis Spinder (Spinder), a firearm and tool mark examiner employed at the State Crime Lab, testified concerning the weapon. Spinder testified that Roedel fired a .357 magnum when he killed Dawn. Spinder testified that the weapon cannot fire unless something pulls the trigger. He testified that the weapon cannot discharge even if someone drops the weapon with the hammer cocked.

¶27    Dr. Gary Dale testified concerning Dawn's injuries and cause of death. Dr. Dale testified that the bullet that killed Dawn had caused extensive damage as it passed through her body. The bullet entered the back of Dawn's right shoulder, damaged two ribs, and

7

pierced the back of her right lung. The bullet traveled through and damaged two thoracic vertebrae, passed through Dawn's left lung, and grazed her diaphragm, stomach, and spleen before exiting her body. Dr. Dale opined that bleeding into the cavities surrounding Dawn's lungs likely had caused her death. He estimated that it took a few minutes for Dawn to die.

¶28 Roedel called Ann Harris (Harris), a forensic chemist with the State Crime Lab, to testify concerning gunshot residue. Harris testified that she found more particles of likely gunshot residue on Dawn's hands than she found on Roedel's. She stated on cross-examination, however, that she could not draw any conclusions from this disparity regarding who had fired the gun. Harris testified that she could not state that a person had fired a weapon simply from the presence of gunshot residue. She testified that ordinary activities, such as putting hands in pockets or running hands through hair, might remove the residue. Harris stated, "So I'm not surprised that if he had fired the gun that he wouldn't have much [gunshot residue] on him."

¶29 The District Court excused the jury at the close of the evidence. The District Court conducted the subsequent proceedings on the record, with Roedel initially present. The District Court asked Roedel's counsel if he wanted Roedel present during the settling of instructions. Roedel's counsel responded "No." The District Court told Roedel "You can stay for instructions or you can not stay." Roedel stated, "Okay. We're done, then?" and departed in the custody of the Sheriff's office. The District Court proceeded to conduct the settling of jury instructions.

¶30 The jury commenced deliberations at 11:39 a.m. on April 6, 2006. The jury returned at 1:30 p.m. that same day with a verdict. The jury convicted Roedel of deliberate homicide and knowingly using a firearm while committing that offense.

¶31 The District Court conducted a sentencing hearing on May 11, 2006. Roedel testified. The State asked Roedel if he was "quick to anger" and "quick to threaten people." Roedel denied having such a temperament. The State then questioned Roedel about a past incident in which he allegedly had kissed a thirteen year old girl. The State asked Roedel how he had responded to the allegation to demonstrate that Roedel had a volatile temper. Roedel stated that he had challenged the man who accused him of the inappropriate kiss to a fight. Roedel stated that he did not remember how he had reacted to the officer who spoke with him on the phone.

¶32 The State presented Detective Landis at the sentencing hearing for rebuttal. Detective Landis testified that Roedel had reacted angrily when asked by an officer if he inappropriately had kissed a thirteen year old girl. The State then directed Detective Landis to play a tape recording of Roedel's conversation with the officer. Roedel objected on the grounds that the State had not given him a copy of the tape before the hearing. The State responded that it initially had not intended to play the tape. The District Court allowed the State to play the tape.

¶33 The tape records Roedel angrily uttering a stream of profanity and threats aimed at officers and another man. Roedel requested a short recess upon the tape's conclusion. The District Court allowed a fifteen minute recess. Following the recess, Roedel declined the

9

District Court's offer to cross-examine Detective Landis. Roedel also declined the District Court's offer to rebut the tape recording.

¶34 The District Court proceeded to hear the parties' arguments and recommendations for sentencing. The District Court sentenced Roedel to eighty years at the Montana State Prison, with ten years added for use of a weapon. Roedel appeals.

## STANDARD OF REVIEW

¶35 We review *de novo* claims of ineffective assistance of counsel, as they present mixed questions of law and fact. *State v. Herrman*, 2003 MT 149, ¶ 18, 316 Mont. 198, ¶ 18, 70 P.3d 738, ¶ 18. We review the sufficiency of the evidence to support a jury verdict of guilty to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution. *State v. Rennaker*, 2007 MT 10, ¶ 16, 335 Mont. 274, ¶ 16, 150 P.3d 960, ¶ 16. We will not disturb a jury's determination with regard to disputed questions of fact and credibility. *Rennaker*, ¶ 16. We employ a plenary review to determine whether a violation of a criminal defendant's right to be present at all critical stages of his trial has occurred. *State v. Kennedy*, 2004 MT 53, ¶ 13, 320 Mont. 161, ¶ 13, 85 P.3d 1279, ¶ 13. We review a district court's determination of the admissibility of evidence for abuse of discretion. *State v. Nelson*, 2002 MT 122, ¶ 9, 310 Mont. 71, ¶ 9, 48 P.3d 739, ¶ 9.

## DISCUSSION

### ISSUE ONE

¶36 *Does Roedel present a record-based claim of ineffective assistance of counsel regarding his counsel's failure during voir dire to challenge a juror for cause and to move to strike the venire?*

¶37 Roedel claims that he received ineffective assistance of counsel when his counsel did not challenge Meyers for cause. He argues that his counsel's failure to move to strike the entire venire due to Meyers's statement regarding discussions of Roedel's case within the Sheriff's office also constituted ineffective assistance.

¶38 We will not review all claims of ineffective assistance of counsel on direct appeal. A defendant claiming ineffective assistance of counsel more appropriately makes his claims in a petition for post-conviction relief when the record does not provide the basis for the challenged acts or omissions. *Herrman*, ¶ 33. Direct appeal serves as the proper forum for determining ineffective assistance of counsel when appellants assert claims on record-based actions, untaken obligatory actions, or implausible actions. *State v. Kougl*, 2004 MT 243, ¶¶ 14-15, 323 Mont. 6, ¶¶ 14-15, 97 P.3d 1095, ¶¶ 14-15. We have recognized the flaw in attempting to determine the presence of tactical reasoning behind omissions or inactions of trial counsel from a cold trial record. *Herrman*, ¶¶ 28-30; *State v. Racz*, 2007 MT 244, ¶¶ 27-29, 339 Mont. 218, ¶¶ 27-29, 168 P.3d 685, ¶¶ 27-29.

¶39 The record is silent as to why Roedel's counsel declined to challenge Meyer for cause or to move to strike the entire venire. Roedel also fails to demonstrate that no plausible justification exists for his counsel's alleged failure to take either action. We cannot evaluate Roedel's claims of ineffective assistance of counsel based solely on the trial record.

**ISSUE TWO**

¶40    *Did Roedel's counsel provide ineffective assistance during voir dire by discussing a newspaper article that referred to his counsel as a "liar?"*

¶41    Roedel argues that his counsel unnecessarily called into question his counsel's credibility when he discussed a newspaper article that referred to his counsel as a "liar." Roedel asserts that in saying, "[m]an, I wish I hadn't said anything . . . ," his counsel demonstrated that no plausible justification existed for referencing the article. Roedel claims that his counsel's reference to the article deprived him of the right to a fair and impartial trial.

¶42    We review those claims of ineffective assistance of counsel suitable for review in a direct appeal by applying the test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). A defendant must establish that counsel's performance fell below an objectively reasonable standard, and that a reasonable likelihood exists that a different outcome would have resulted but for counsel's actions. *Kougl*, ¶ 11. The defendant must overcome the strong presumption that counsel's actions met the reasonable standard, and counsel has a great deal of discretion in deciding which tactics to employ on behalf of the defendant. *Kougl*, ¶ 11.

¶43    Roedel's counsel first asked if any panel member had read any of the material regarding the death penalty investigation in California. One panel member indicated that she had read a story in a local paper that had mentioned Roedel's counsel. Roedel's counsel described his involvement and stated, "and they called me a liar, and I'm going, well, that's a great deal." The panel member who read the article asked Roedel's counsel to tell his side of the story. Roedel's counsel then gave his account of the story and stated, "[a]nd I

promised to tell the truth, and yeah, we really did it." He asserted that he had told the truth about his office's disreputable practices.

¶44 The interchange between Roedel's counsel and the jury panel reveals that he used the story to demonstrate his willingness to tell the truth in the face of bad publicity and negative consequences. The tactical reasoning behind his counsel's decision to refer to the article appears from the context of the trial court record. We conclude that Roedel's counsel made a calculated decision to discuss the article in order to respond to its assertion that he was a "liar," notwithstanding his final statement of regret at having mentioned the investigation. We further conclude that this decision did not constitute ineffective assistance of counsel.

### ISSUE THREE

¶45 *Did Roedel's counsel provide ineffective assistance by failing to object to certain testimony?*

¶46 Roedel also claims that he received ineffective assistance of counsel when his counsel did not object to testimony from Harris. Roedel called Harris to testify as an expert on gun powder residue. He contends that Harris implied that Roedel had been the shooter when she stated that she could make no conclusion as to whom had fired the weapon. Roedel asserts that his counsel's failure to object to her testimony constituted ineffective assistance.

¶47 Roedel must overcome a strong presumption that counsel performed effectively and show both (1) that counsel's performance fell below an objectively reasonable standard, and (2) that a different outcome would have resulted but for counsel's actions. *Kougl*, ¶ 11. Roedel fails to demonstrate that his counsel's performance fell below an objectively reasonable standard.

13

¶48    Harris explicitly stated that she did not draw any conclusions from the differing amounts of gunshot residue present on Dawn's and Roedel's hands. Harris explained how regular mannerisms might remove gunshot residue from a person's hands. Harris testified that she could not make a conclusion that anyone, including Roedel, had shot the weapon because of the possibility of removing residue through normal activities. Contrary to Roedel's assertion, Harris's testimony did not imply that Roedel had fired the weapon. Harris simply explained why she could not conclude that any particular person had fired the gun.

¶49    Even assuming, for sake of argument, that Harris implied that Roedel had fired the weapon, this point fails to establish that Roedel's counsel provided ineffective assistance. Roedel does not argue that his counsel should have objected in order to establish that Dawn fired the gun. Roedel instead faults his counsel only for not objecting to an alleged implication that Roedel had fired the gun.

¶50    The uncontroverted testimony at trial revealed, however, that Roedel had fired the weapon. Roedel admitted on several occasions during the investigation that he had fired the shot that killed Dawn. He contested only whether he had shot Dawn purposely or knowingly. The grounds offered in support of the unmade objection fail to establish error on the part of Roedel's counsel due to Roedel's admission. Though Harris could not conclude that Roedel had fired the gun based on gunshot residue, the State put forth other witnesses who did reach that conclusion based upon Roedel's admissions. No reason existed for Roedel's counsel to object to Harris's testimony for the purpose of preventing the jury from

14

hearing the alleged implication that Roedel had fired the gun. The record reveals that Roedel's counsel provided assistance that met an objectively reasonable standard.

## ISSUE FOUR

¶51    *Did the jury have sufficient evidence to convict Roedel?*

¶52    Roedel argues that the State did not put forth sufficient evidence to establish that he purposely or knowingly caused Dawn's death. Montana law provides that a person commits deliberate homicide if the person purposely or knowingly causes the death of another human being. Section 45-5-102(1)(a), MCA. A person acts purposely if it is the person's conscious object to cause a result. Section 45-2-101(65), MCA. A person acts knowingly with regard to a result when that person is aware that it is highly probable that the person's conduct will cause that result. Section 45-2-101(35), MCA.

¶53    The State presented evidence that someone fired three shots on August 27, 2005, at Roedel's residence. Witnesses testified hearing the gunshots at 11:00 p.m. Roedel phoned 911 dispatch at 11:03 p.m. Dr. Dale testified that Dawn died from injuries caused by a gunshot, and that she likely survived for several minutes after sustaining her injuries.

¶54    Roedel admitted nearly from the outset of the investigation to having fired the shot that killed Dawn. He initially claimed that Dawn had fired the gun twice before his alleged accidental firing of the gun. Roedel later contradicted this account of events. Roedel then admitted on multiple occasions to firing all three shots.

¶55    Roedel's neighbors testified that they heard three shots fired in quick succession. A firearms expert testified that the gun used in the shooting was incapable of discharging unless something pulled the trigger. Detective Landis found the gun lying on the bed with

15

the hammer cocked, ready to fall on a live round. Detective Landis discovered three spent cartridges and three live rounds in the gun.

¶56 This Court reviews the jury's determinations of fact in the light most favorable to the prosecution. *Rennaker*, ¶ 16. Though witnesses provided slightly differing accounts regarding certain aspects of the events that night, this Court will not disturb the jury's determinations on these matters. *Rennaker*, ¶ 16. We conclude that the State presented sufficient evidence to allow the jury to find that Roedel acted purposely or knowingly in causing Dawn's death.

## ISSUE FIVE

¶57 *Did the District Court violate Roedel's right to be present at all critical stages when it did not require Roedel's presence or an express waiver of his presence during the settling of the jury instructions?*

¶58 Roedel claims that the District Court violated his right to appear and defend in person by allowing him to leave during the settling of jury instructions without obtaining his express and informed waiver. He argues that the District Court's failure to obtain his express waiver constituted structural error and requires reversal of his conviction.

¶59 A defendant has a constitutional right to appear and defend a criminal prosecution in person. Mont. Const. art. II, § 24. We have held that the right to appear and defend in person constitutes a fundamental right that a defendant can waive only through a voluntary, intelligent, and knowing waiver. *State v. Tapson*, 2001 MT 292, ¶¶ 15, 28, 307 Mont. 428, ¶¶ 15, 28, 41 P.3d 305, ¶¶ 15, 28. We have determined that a defendant's fundamental right to be present at the proceedings applies without exception only to those stages deemed

16

critical. *Tapson*, ¶ 37; *State v. Riggs*, 2005 MT 124, ¶¶ 51-52, 327 Mont. 196, ¶¶ 51-52, 113 P.3d 281, ¶¶ 51-52.

¶60    This Court has not faced the question of whether the settling of jury instructions constitutes a critical stage of the proceedings for purposes of the right to be present. We note, however, that the legislature has spoken on the necessity of the defendant's presence at this stage of the proceedings. Section 46-16-410(4), MCA, specifically allows for the absence of the defendant during the settling of jury instructions. Roedel does not challenge the statute's constitutionality. Accordingly, we will not address whether § 46-16-410(4), MCA, impermissibly relieves a court of the obligation to obtain an express waiver of a defendant's presence from the settling of jury instructions. *See e.g. Silvestrone v. Park County*, 2007 MT 261, ¶ 16, ___ Mont. ___, ¶ 16, ___ P.3d ___, ¶ 16.

¶61    The District Court asked Roedel's counsel if he wanted Roedel present during the settling of instructions. Roedel's counsel responded "No." The District Court then told Roedel "You can stay for instructions or you can not stay." Roedel stated "Okay. We're done, then?" and returned to the custody of the Sheriff's office. The District Court proceeded on the record to settle the jury instructions.

¶62    Section 46-16-410(4), MCA, specifically allows for the defendant's absence from the settling of jury instructions. The statute makes no mention of the need for the court to obtain the defendant's voluntary, intelligent, and knowing waiver. The court offered Roedel the chance to be present for the settling of the jury instructions. Roedel declined. The statute requires nothing more. We conclude that the District Court's actions did not constitute structural error.

17

**ISSUE SIX**

¶63   *Did the District Court err in allowing the State to play a tape recording at the sentencing hearing without first giving Roedel an opportunity to review it?*

¶64   Roedel faults the District Court for listening to the tape recording of his profanity laden rant during the sentencing hearing. Roedel asserts that the District Court denied him the opportunity to prepare properly for, and respond to, the tape by allowing the State to play the tape without giving him time in advance to listen to its contents. He argues that this decision violated his right to have the District Court sentence him on the fullest information possible.

¶65   The rules of evidence do not control in sentencing hearings. *State v. Ferguson*, 2005 MT 343, ¶ 109, 330 Mont. 103, ¶ 109, 126 P.3d 463, ¶ 109. The rules of evidence do not apply in order to provide a sentencing court with access to the fullest information possible concerning a defendant's life and character. *Ferguson*, ¶ 109. The right to due process, however, requires a sentencing court to provide the defendant with an opportunity to explain, argue, and rebut any information that may lead to a deprivation of life or liberty. *State v. Winkle*, 2002 MT 312, ¶ 14, 313 Mont. 111, ¶ 14, 60 P.3d 465, ¶ 14.

¶66   The State presented several letters at the sentencing hearing in *Winkle* without providing the defense a copy of the last letter in advance. *Winkle*, ¶ 6. The letters asserted that Winkle had been violating a condition of his release. *Winkle*, ¶ 5. Winkle denied the common assertion in the letters, but indicated that he did not want to offer rebuttal. *Winkle*, ¶ 7. Winkle asked the court to proceed to sentencing. *Winkle*, ¶ 7. Winkle moved for a continuance after the oral imposition of his sentence. *Winkle*, ¶ 11. He claimed that the

18

introduction of the final letter had violated his right to due process. *Winkle*, ¶ 11. We rejected Winkle's argument. *Winkle*, ¶ 19. We noted that Winkle attempted to rebut the information in the letter. *Winkle*, ¶ 16. We noted, however, that Winkle did not ask for a continuance until after the court had imposed his sentence. *Winkle*, ¶ 16.

¶67 Similar to *Winkle*, the District Court offered Roedel the opportunity to rebut the tape recording. The District Court invited Roedel to explain, argue, or rebut the tape recording when it asked whether he wished to cross examine the State's witness or to offer rebuttal. Roedel declined to take advantage of either opportunity. The fact that he had the opportunity satisfied the District Court's obligation to afford Roedel due process.

¶68 Roedel argues that allowing him the opportunity to preview the tape in advance would not have delayed significantly the hearing. We agree. Roedel's argument fails to show, however, how this fact constitutes failure on the District Court's part. Indeed, the record reveals that the District Court granted Roedel's request for a recess immediately following the playing of the tape. Nothing prevented Roedel from requesting this recess, or moving for a continuance, before the State played the tape. The District Court had no affirmative obligation to take such action on Roedel's behalf. *Winkle*, ¶ 19. We conclude that the District Court did not abuse its discretion in allowing the State to play the tape at the sentencing hearing.

¶69 Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE