

DA 08-0040

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 129

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

CHESTER LAWRENCE PRICE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DC 2001-35
Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          William F. Hooks, Attorney at Law, Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General; John Paulson, Assistant
Attorney General, Helena, Montana

          Thomas P. Meissner, Fergus County Attorney, Lewistown, Montana

Submitted on Briefs:  November 26, 2008

Decided:  April 14, 2009

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1      Chester Lawrence Price (Price) appeals his conviction in the Tenth Judicial District, Fergus County, for sexual intercourse without consent in violation of § 45-5-503, MCA. We affirm.

¶2      We review the following issue on appeal:

¶3      *Did the District Court prejudice Price when it conducted eleven in-chambers conferences without Price present?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4      Price comes before this Court for a third time.  We affirmed Price's conviction in *State v. Price* (*Price I*), 2003 MT 373N, 319 Mont. 424, 82 P.3d 37 (Table), 2003 WL 23028878.  We reversed the District Court's denial of Price's petition for post-conviction relief in *Price v. State* (*Price II*), 2007 MT 307, 340 Mont. 109, 172 P.3d 1236.  We remanded for an entry of an order by the District Court granting Price an opportunity to appeal based on his absence from eleven in-chambers meetings during his original trial. *Price II*, ¶ 20.  We derive from *Price I* and *Price II* the facts pertinent for this appeal.  We will discuss additional facts as necessary.

¶5      The State charged Price on August 21, 2001, with forcing his 14-year-old niece, C.W., to engage in sexual intercourse without her consent.  C.W. lived in Lewistown with her mother and father, Cathy and Steve, and her 24-year-old half brother, Clint.  Price lived in Lewistown with his wife, Faye, and two of their three daughters.  Price and C.W.'s mother are siblings and they have three other sisters, two of whom testified: Melinda "Mindy" Riehl

2

(Mindy) and Shannon Rausch. At the time of the incident, Steve and Cathy were traveling to Colorado to return Clint's two small children to their mother, Clint's former wife. Clint could not personally transport his children home due to a conviction on a sexual offense that he had committed in Colorado.

¶6      On August 10, 2001, Price, Faye, two of their daughters, C.W., and Clint decided to go boating on a nearby lake. When they returned to town, C.W. and Clint went to the store so that Clint could buy beer. C.W. wanted to attend a party with Clint. Price testified that he and Faye were concerned for C.W.'s safety and insisted that C.W. return to the Price residence rather than attend the party with Clint.

¶7      After arriving at the Price residence, Price's daughter gave C.W. one of Price's dirty shirts to wear because C.W.'s clothing was wet from the boating excursion. Clint and Price got into a physical altercation about where C.W. was going to stay that night. Clint ultimately left the residence. Price and C.W. went to look for Clint. C.W. was concerned about Clint's safety due to the amount of alcohol that he had consumed. They found Clint, but another argument soon erupted between Clint and Price. Witnesses to the altercation called the police. The police arrested Clint when they arrived at the scene and took Clint into custody.

¶8      C.W. and Price returned to Price's house. C.W. testified that she, Price, and Faye reclined on an air mattress to watch television. Price testified that only the women were on the air mattress and that he was on the floor. C.W. stated that Price began to rub her sides and chest after Faye fell asleep. C.W. claimed that Price eventually moved his hands below

3

her waist under her clothing. Price woke Faye and took her upstairs. He then returned to the air mattress.

¶9    C.W. testified that she told Price "no" at least 30 times, but he persisted with his touching. Price penetrated her vagina with his fingers and tongue and licked her breasts. Price eventually stopped touching C.W. He left the room. C.W. dressed and ran to a neighbor's house to get help. The neighbor called several of C.W.'s friends.

¶10    C.W. took a shower at her friend's house because she felt "dirty and disgusting." C.W. went home and washed all of her clothing except her swimsuit top. Clint called C.W. from jail. C.W. told Clint that Price had molested her. Clint called C.W.'s mother Cathy. Cathy had just returned home from Colorado. Clint told Cathy that Price had molested C.W. Cathy called the police. C.W. told Cathy what had happened in the presence of several police officers. Cathy took C.W. to the hospital. Doctors examined C.W. and completed a rape kit that included vaginal swabs. Cathy gave the swimsuit top to the police during the examination.

¶11    Michelle Griffin, a forensic scientist at the Montana State Crime Lab, testified that she found trace amounts of saliva on C.W.'s vaginal swabs. The sample did not contain sufficient amounts of saliva, however, to develop a DNA profile. Griffin further testified that she found four saliva stains on the inside of C.W.'s swimsuit top. The DNA analysis of this saliva excluded Steve, Cathy, and Clint. Price's DNA profile proved consistent with the saliva stains. Price attributed the presence of his DNA on C.W.'s swimsuit to his dirty shirt that his daughter had loaned to C.W. C.W. had worn the shirt over her swimsuit top after

4

returning from the lake. Price claimed that his nasal discharge on the shirt had transferred onto C.W.'s swimsuit top.

¶12 Timothy J. Whalen (Whalen) served as Price's trial counsel. Twelve in-chambers conferences took place throughout the trial. The District Court, counsel for the State, and counsel for Price discussed legal and procedural issues at the second and third conferences. The court excused a prospective juror at the fourth conference. The prospective juror felt that he could not be objective because his daughter had been a rape victim.

¶13 The District Court and Whalen both questioned Juror Cantrell at the eighth conference. The court granted Whalen's motion to remove Juror Cantrell based on possible bias against Price. The District Court, Whalen, and the State discussed, and the court ruled on, evidentiary issues at the first, fifth, sixth, seventh, tenth, eleventh, and twelfth conferences. The evidentiary issues involved Price's primary defense theories: 1) that Clint, not Price, had committed the crime, and 2) that C.W.'s family had framed Price.

¶14 Whalen attempted at these conferences to persuade the District Court to allow Price to introduce evidence of Clint's criminal history and other past acts. Whalen requested the court to allow Price's sister Mindy to testify that Clint had tried to rape one of her daughters. Whalen argued that Mindy's testimony would establish "a strong possibility" that C.W. and Clint had engaged in a sexual relationship. Price and his wife would testify, alternatively, that C.W. was afraid of Clint and that she was not afraid of Price. Mindy further would testify that C.W. had told her that C.W.'s parents, Steve and Cathy, previously had interfered

with the physical evidence from a rape that Clint allegedly had committed in Colorado. Steve and Cathy apparently had hoped to "confuse the DNA results."

¶15 Price was present for only one of the twelve conferences. Whalen purported to waive Price's right to be present at eight of the eleven conferences, after the court questioned him about Price's absence and prompted Whalen to waive Price's right. Whalen did not waive Price's right to be present in the other three conferences. Price was present at the ninth of the twelve conferences, and Whalen purported to have Price retroactively waive his right of presence at the preceding eight conferences.

¶16 After the jury convicted Price, he retained Gary Wilcox (Wilcox) to handle his direct appeal. Price raised two evidentiary issues in that appeal. Price first argued that the District Court improperly had excluded evidence that would have established that Clint had committed the crime rather than Price. *Price I*, ¶ 15. Price also contended that the court improperly had excluded evidence that would have demonstrated that C.W.'s family had framed Price. *Price I*, ¶¶ 14, 19. We agreed with the District Court's decision to exclude the proposed evidence on the grounds that it was irrelevant and "highly inflammatory." *Price I*, ¶¶ 20-21.

¶17 Price retained new counsel and filed a petition for post-conviction relief in the District Court. Price challenged several alleged errors by his trial counsel. Price also alleged that his appellate counsel had rendered ineffective assistance by failing to appeal the issue of Price's absence from the in-chambers meetings and Whalen's waiver of Price's right to be present. The District Court found that Wilcox's failure to challenge Price's absence from the in-

6

chambers meetings fell below an objective standard of reasonableness. The District Court concluded, however, that Whalen's errors did not prejudice Price. Price appealed the District Court's denial of his petition for post-conviction relief. *See Price II*, ¶ 8.

¶18 We agreed that Wilcox's performance fell below an objective standard of reasonableness. *Price II*, ¶ 14. We determined that Wilcox's failure to raise the issue of Price's absence from the in-chambers meetings created a "probability sufficient to undermine confidence in the outcome" of Price's appeal. *Price II*, ¶¶ 15-16, 19. We emphasized that the District Court had focused only on the three in-chambers meetings at which Whalen had not waived Price's right to be present. *Price II*, ¶ 16. The District Court had not analyzed the other eight conferences from which Price was absent. *Price II*, ¶ 16. We reversed the District Court's denial of the post-conviction petition. We remanded for an entry of an order by the District Court granting Price an opportunity to appeal based on his absence from the eleven in-chambers meetings. *Price II*, ¶ 20. Price filed this appeal.

## STANDARD OF REVIEW

¶19 We conduct a plenary review to determine whether a district court has violated a criminal defendant's right to be present at all critical stages of the defendant's trial. *State v. Roedel*, 2007 MT 291, ¶ 35, 339 Mont. 489, 171 P.3d 694.

## DISCUSSION

¶20 *Did the District Court prejudice Price when it conducted eleven in-chambers conferences without Price present?*

7

¶21 Price argues that the District Court violated his state and federal constitutional rights when the court conducted eleven separate in-chambers conferences without Price present. The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to be present at all criminal proceedings against him. *State v. Tapson*, 2001 MT 292, ¶ 14, 307 Mont. 428, 41 P.3d 305. The defendant also has a due process right to be present "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *State v. Matt*, 2008 MT 444, ¶ 16, 347 Mont. 530, 199 P.3d 244 (citing *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987)).

¶22 Article II, Section 24, of the Montana Constitution expressly guarantees a defendant the right to appear and defend a criminal prosecution in person. The defendant has the legal right to be present during the proceeding of the trial whenever "anything is done which in any manner affects his right." *Matt*, ¶ 17. A defendant's fundamental right to be present at the proceedings applies without exception to those stages deemed critical. *Roedel*, ¶ 59; *Tapson*, ¶ 37; *State v. Riggs*, 2005 MT 124, ¶¶ 51-52, 327 Mont. 196, 113 P.3d 281.

¶23 When considering whether a district court has violated the defendant's right to be present, we generally first have considered whether the court excluded the defendant from a "critical stage" of the proceeding. *State v. Godfrey*, 2009 MT 60, ¶ 25, 349 Mont. 335, ___ P.3d ___ (citing *State v. Mann*, 2006 MT 160, ¶ 15, 332 Mont. 476, 139 P.3d 159; *Matt*, ¶ 18). We also have considered whether the defendant waived his right to presence through a voluntary, intelligent, and knowing waiver. *See Tapson*, ¶¶ 25-26; *Matt*, ¶¶ 23-28.

8

¶24 A district court's violation of a defendant's right to be present does not constitute automatic reversible error. *Mann*, ¶ 15. If we determine that the court has violated the defendant's right to be present, we consider "the effect the violation has on the defendant to determine whether the defendant suffered any conceivable prejudice." *Godfrey*, ¶ 25 (citing *Mann*, ¶ 15). Where the record shows that the defendant was not prejudiced, we have affirmed. *Godfrey*, ¶ 25 (citing *Kennedy*, 2004 MT 53, ¶¶ 27, 34, 320 Mont 161, 85 P.3d 1279). We have reversed where the lack of a complete record makes it impossible to say that there was no prejudice to the defendant. *Tapson*, ¶ 31.

¶25 We conclude that Price's absence from the in-chambers conferences did not cause him prejudice, so we will not consider the initial questions of whether the conferences constituted "critical stages" of the trial or whether Price validly waived his right of presence. We will assume for the purposes of our analysis that the conferences constituted critical stages, and that Price did not validly waive his right to be present.

¶26 In *Kennedy*, we determined that the district court had violated the defendant's right to be present when it excluded him from a conference in which the court questioned and ultimately removed a juror. *Kennedy*, ¶ 27. We concluded that "such exclusion did not cause Kennedy prejudice" because any opportunity that Kennedy missed to question the juror was mooted when the court took corrective action by removing the juror from the jury panel. *Kennedy*, ¶ 34. We also emphasized the fact that we readily could assess the record for prejudice because it was not ambiguous with regard to the District Court's conversations with the excused juror. *Kennedy*, ¶¶ 32-33 (distinguishing *Tapson*, ¶¶ 30-33).

9

¶27 In *Tapson*, the court entered the jury room during deliberations without the defendant, counsel for the defendant, or counsel for the State present. The court did not return for eleven minutes. *Tapson*, ¶ 11. We stated that "the general rule, § 46-20-701(2), MCA, requires the defendant to, among other things, establish that the claimed error was prejudicial." *Tapson*, ¶ 35. We did not require Tapson to meet this burden, however, as "the only means to meet that burden – the court record – was not preserved by reason of the commission of the error itself." *Tapson*, ¶ 35. We determined that the deficit in the record made it impossible to conclude that Tapson did not suffer prejudice. *Tapson*, ¶¶ 30-33.

¶28 The district court in *Riggs* twice spoke with jurors outside Riggs's presence. *Riggs*, ¶¶ 42-45. Counsel for the State and counsel for the defendant attended both conferences. *Riggs*, ¶¶ 43, 45. The first juror, a professor, had recognized a witness as one of his students. *Riggs*, ¶ 43. The court questioned the juror in an effort to confirm that the juror's knowledge of the witness would not affect his ability to be fair and impartial. Both counsel agreed that the juror could continue to serve. *Riggs*, ¶ 44.

¶29 The court met with the second juror on the last day of the trial after the settlement of jury instructions. *Riggs*, ¶ 45. The juror expressed concern that he might have to forfeit non-refundable airline tickets if deliberations continued beyond that day. *Riggs*, ¶ 45. The court met separately with the juror and assured the juror that he would not need to forfeit his airline tickets, even if it meant that the jury would be required to deliberate into the night. *Riggs*, ¶ 45. We considered the record and determined that "the defendant has made no persuasive claim of prejudice arising out of the episodes under consideration." *Riggs*, ¶ 54.

10

¶30 We likewise determined that the defendant had failed to prove prejudice in *DuBray v. State*, 2008 MT 121, ¶¶ 36-37, 342 Mont. 520, 182 P.3d 753 (citing *Riggs*, ¶ 54). DuBray claimed that the district court had violated his right to be present at all critical stages when it met with the jury foreman without DuBray present. *DuBray*, ¶¶ 34-35. The jury foreman reported that one of the jurors had claimed to be a psychic. The court met with the jury foreman, counsel for the State, and counsel for the defendant. *DuBray*, ¶ 35. The jury foreman assured the court that the juror, who had informed two other jurors that she was psychic, was not the reason the jury had yet to reach a verdict. The court then discussed the issue with counsel outside the presence of the jury foreman. *DuBray*, ¶ 35. The court met again with counsel and the jury foreman and instructed the jury foreman to return to the jury room and allow the deliberations to move forward. DuBray's counsel waived DuBray's presence at each of these on the record discussions. *DuBray*, ¶ 35. We emphasized that DuBray's counsel had consented to the court's approach in addressing the jury foreman's concerns. We dismissed as "pure speculation" DuBray's claim that, if he had been present, he might have demanded that his counsel act differently. *DuBray*, ¶ 37.

¶31 This Court recently addressed in *Matt* the issue of prejudice within a harmless error analysis. *Matt*, ¶ 29. The Court stated that Matt's absence from an in-chambers conference did not affect the framework within which Matt's trial proceeded or necessarily render the trial fundamentally unfair. Matt's absence therefore constituted trial error, rather than the type of structural error that would require automatic reversal. *Matt*, ¶ 43. The *Matt* Court then stated that we presume that such trial error prejudices the defendant, and that "the State

11

has the burden to rebut the presumption by demonstrating there is no reasonable possibility the violation prejudiced the defendant in light of the interests the right of presence was designed to protect." *Matt*, ¶ 38.

¶32　We have referred, at times, to "harmless error" in the context of critical stages cases and the potential for prejudice. *See e.g. Kennedy*, ¶¶ 32-35; *Tapson*, ¶¶ 30-31. We have not applied, before *Matt*, the type of harmless error analysis prescribed by *Van Kirk* for situations involving the admission of prejudicial evidence. *See State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 735. We have not required the State to satisfy a burden of proof. We have determined that the defendant did not make a persuasive claim of prejudice, *Riggs*, ¶ 54; *DuBray*, ¶¶ 36-38, or we have required no burden and simply examined the record to determine whether the violation caused the defendant to suffer prejudice. *Mann*, ¶¶ 15-21; *see also Kennedy*, ¶¶ 33-35; *Tapson*, ¶¶ 30-33. This latter approach comports with our duty as an appellate court to review the entire record to determine whether the defendant has suffered prejudice. Section 46-20-701(1), MCA.

¶33　The record is not ambiguous as to what occurred at the in-chambers conferences throughout Price's trial. Unlike the situation in *Tapson*, ¶ 31, where no record existed of the court's foray into the jury room, we readily can assess for prejudice the District Court's actions at the conferences. *Kennedy*, ¶ 33. Nothing that occurred at the conferences concerned or affected the framework within which Price's trial proceeded or necessarily rendered the trial fundamentally unfair. *Matt*, ¶ 43. The conferences did not "contaminate[] the trial mechanism." *Matt*, ¶ 43. The District Court's failure to include Price in the

conferences at worst constituted trial error, rather than structural error that would require automatic reversal. *Matt*, ¶ 43.

¶34 Price argues that his absence from the eighth conference, in which the District Court removed Juror Cantrell, "is dispositive of this appeal." The State contends that the court's corrective action in removing Juror Cantrell benefited Price and did not deprive him of a fair trial. The court conducted a conference with Juror Cantrell after Juror Cantrell revealed that she previously had worked with Price's mom, Donna Givan. Givan later would testify as a defense witness.

¶35 Juror Cantrell informed the District Court that as she had walked out of the courtroom at the end of the previous day's proceedings, she had heard someone exclaim "Well, what is she doing here?" Juror Cantrell realized that the speaker was Givan. Juror Cantrell approached the court because she felt uncomfortable and did not want "someone coming up later and . . . want[ing] a mistrial or something." Price's counsel, Whalen, asked Juror Cantrell if she might view Givan's testimony differently, "considering the way [the comment] was said." Cantrell said "No," but then stated that "I think it would make me really think about . . . what she says . . . . In - - in the respect if she is telling the truth or not."

¶36 Whalen then asked Juror Cantrell if he was correct that, because of Givan's comment, "you would watch her testimony more closely?" Juror Cantrell responded, "I think so. I think it would make me feel like I would want to make sure that everything she said was the truth." Juror Cantrell continued "I'm not going to say that she is going to lie . . . but . . . I

13

think that you can kind of tell sometimes when people really aren't telling the truth." Whalen asked Juror Cantrell if she would view Givan's testimony with more skepticism after she heard the comment. Juror Cantrell initially responded "Not really." Juror Cantrell then reconsidered and said "Sort of."

¶37 Whalen announced that "even though Juror Cantrell is reticent to state that she couldn't be objective," he had "developed a strong feeling that she took offense at the comment that Donna Givan made." Whalen demanded that the District Court remove Juror Cantrell from the jury because he felt she would view "one of our key witness's . . . testimony with skepticism." The District Court granted Whalen's request. The District Court stated that it also had the "distinct sense that there was a heightened scrutiny that [Juror Cantrell] was going to apply to this particular testimony." The court noted that "if we had heard [Juror Cantrell's statements] initially in the voir dire it is likely that we would have struck her for cause." The prosecutor did not object to Juror Cantrell's removal. He too sensed that Juror Cantrell was "really nervous and . . . uncomfortable."

¶38 Whalen, the District Court, and counsel for the State listened to Juror Cantrell's explanation and observed her demeanor. They all agreed that the court should remove Juror Cantrell based on her possible bias towards Price. The District Court mooted the potential prejudice towards Price when it removed Cantrell. *See Kennedy*, ¶ 34.

¶39 Price claims for the first time on appeal that if he had been present he might have convinced his counsel to keep Juror Cantrell on the jury. Price entirely failed to mention Juror Cantrell at the post-conviction hearing at the District Court. Price's assertion

14

contradicts his testimony at his post-conviction hearing regarding his feelings toward Juror Finkbeiner. The court seated Juror Finkbeiner after it removed Juror Cantrell. Juror Finkbeiner had failed to disclose during voir dire that he knew Price. Price failed to express any dissatisfaction with Whalen's motion to remove Juror Cantrell or with the court's decision to replace Juror Cantrell with Juror Finkbeiner. Price in fact conceded that he was not "complaining that [Juror] Finkbeiner was on the jury panel that convicted [him]."

¶40 The State convincingly argues that "it is unlikely that Price would have argued against his attorney's request to remove a juror whose knowledge of a key defense witness would cause the juror to view that witness's testimony with skepticism." Price's testimony at his post-conviction hearing regarding his satisfaction with the District Court's decision to seat a new juror bolsters the State's argument. Price's absence from the meeting with Juror Cantrell did not cause him prejudice. *Kennedy*, ¶¶ 33-35; *Mann*, ¶ 15.

¶41 The State argues that Price's presence at the other in-chambers conferences in which the parties discussed evidentiary issues would have conferred, at most, a "shadow benefit." *State v. Schenk*, 151 Mont. 493, 499, 444 P.2d 861, 864 (1968). Price states that defense counsel in these conferences "frequently sought to present new facets on the defense theories: [Clint] was the real perpetrator; he was the source of the salivary amylase; the victim's family previously had tampered with evidence." Price emphasizes the same defense theories, however, that we previously rejected as irrelevant and "highly inflammatory" in *Price I*, ¶¶ 19-21.

15

¶42 We determined that Price's proffered evidence regarding the previous alleged evidence tampering "was irrelevant to the two theories in which the defendant asserted." *Price I*, ¶ 19. We added that "more importantly, the Colorado evidence tampering in an unrelated case bears no relevance to the present offense." *Price I*, ¶ 20. We stated that the proffered evidence would have confused the jury and was inadmissible under M. R. Evid. 403. *Price I*, ¶¶ 19-20. We likewise rejected Price's attempt to introduce evidence designed to show that Clint, not Price, committed the crime. *Price I*, ¶ 26. We stated as a preliminary matter that we agreed with the State's observations that it would have been impossible for Clint to have sexually assaulted C.W., because he was in police custody when that incident occurred. *Price I*, ¶ 19. We concluded that the District Court properly had excluded the proffered evidence under M. R. Evid. 404(b). *Price I*, ¶¶ 25-26.

¶43 Price failed to convince this Court in *Price I* that the evidence offered to support his defense theories was relevant or admissible. Price now claims that his absence at conferences in which his counsel attempted to introduce this same evidence to bolster these same theories caused him prejudice. Price's arguments on appeal in *Price I* were more cogent than anything he could have contributed during the in-chambers conferences. Price's ability to confer with his attorney would not have benefited him when the evidence Price sought to admit was inadmissible because of its highly inflammatory nature and the fact that it was irrelevant to his primary defense theories. *Price I*, ¶¶ 19-21.

¶44 We are convinced, based on our review of the complete record, that Price's absence from the conferences did not cause him any conceivable prejudice. *Godfrey*, ¶ 25; *Mann*,

16

¶ 15. The District Court did not deprive Price of a fair and impartial trial. *Kennedy*, ¶ 35. Price's absence from the in-chambers conferences did not constitute reversible error. *Mann*, ¶ 15; *Kennedy*, ¶ 35.

¶45   Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ JOHN WARNER
/S/ JIM RICE

Justice W. William Leaphart, specially concurring.

¶46   I concur in the result reached by the Court. However, I would reach that result by concluding that the State, although it did not have the benefit of our decision in *State v. Matt*, 2008 MT 444, 347 Mont. 530, 199 P.3d 244, satisfied the standard articulated in *Matt*.

¶47   In *Matt* we held that where there has been a denial of the right to be present, prejudice is presumed. *Matt*, ¶ 38. "If the violation is not structural, then the State has the burden to rebut the presumption by demonstrating there is no reasonable possibility the violation prejudiced the defendant in light of the interests the right of presence was designed to protect." *Matt*, ¶ 38.

¶48   Our decision in *Matt* was issued on December 30, 2008, after the briefing on appeal had been completed in the present matter. Thus the parties and the District Court did not have the benefit of *Matt's* holding that the State has the burden to rebut the presumption of prejudice. Having reviewed the briefs and the record, I conclude the State did, nonetheless,

demonstrate that there is no reasonable possibility that Price was prejudiced by his absence from the proceedings at issue.

¶49 Since the State satisfied the *Matt* burden, I would not, in the context of this case, engage in an analysis of whether *Matt* correctly imposes a "burden" on the State to rebut the presumption of prejudice (see the discussion in ¶ 32 of the Court's Opinion).

/S/ W. WILLIAM LEAPHART

Justice James C. Nelson, dissenting.

¶50 I dissent.

¶51 Inexplicably, the Plurality refuses to follow our recent decision in *State v. Matt*, 2008 MT 444, 347 Mont. 530, 199 P.3d 244. The Plurality's approach is not based on any new arguments or any intervening change in the law. Indeed, we reaffirmed *Matt*'s analytical framework last month in *State v. Godfrey*, 2009 MT 60, 349 Mont. 335, ___ P.3d ___. Nevertheless, the Plurality chooses not to follow this Court's precedents and instead applies the analysis argued by one of the *Matt* dissents. That approach and the rationale for it were considered and rejected by the *Matt* Court, and nothing has occurred during the last three months to justify the Plurality's refusal today to apply the holding of *Matt* to Price's right-of-presence claim.

¶52 In *Matt*, we held that if a defendant's fundamental right to be present has been violated, "prejudice is presumed." *Matt*, ¶ 38. Furthermore, we stated that if the right-of-presence violation does not constitute a "structural defect" in the trial framework, "then *the*

18

*State has the burden to rebut the presumption* by demonstrating there is no reasonable possibility the violation prejudiced the defendant in light of the interests the right of presence was designed to protect." *Matt*, ¶ 38 (emphasis added). We based this approach on the Supreme Court's well-established rule that " '[t]he State bears the burden of proving that an error passes muster under [the *Chapman* harmless-error] standard.' " *Matt*, ¶ 35 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S. Ct. 1710, 1717 (1993), and citing *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)). As noted, we recently reaffirmed this burden in *Godfrey*. *See Godfrey*, ¶ 33 ("With this backdrop, we consider whether the State has met its burden."); *Godfrey*, ¶ 37 ("Similarly, here, based upon the record of these proceedings relative to the jurors' questions and the District Court's responses, we conclude that the State has demonstrated there is no reasonable possibility that Godfrey's exclusion from these proceedings prejudiced him in light of the interests his presence was designed to protect.").

¶53     Today, however, the Plurality reverts to a simple analysis of the record without imposing any burden on the State. Plurality, ¶ 32. This is the approach advocated by one of the *Matt* dissents. *See Matt*, ¶¶ 51-52 (Warner, J., & McKinnon, J., dissenting) ("Rather than place some sort of burden on the State at the appellate level, this Court should carefully examine the record to determine if the denial of the right to be present could have reasonably contributed to a conviction. . . . [A] defendant must make a persuasive claim to the appellate court that he was prejudiced." (paragraph break omitted)). Yet, this approach was implicitly rejected by the *Matt* Court and was explicitly rejected by those same Justices in Chief Justice

19

Gray's concurring opinion. *See Matt*, ¶ 64 (Gray, C.J., and Cotter, Nelson, & Leaphart, JJ., specially concurring) ("[W]e simply cannot—in the face of a violation of the constitutional right to be present at critical stages—ignore the Supreme Court's determination that the State bears the burden of proving that a constitutional error passes muster under the *Chapman* standard.").

¶54    Although the Plurality does not speak for a majority of this Court, today's Opinion nevertheless sends very confusing signals to the bench and bar.  We need one clear test, which the majority of this Court already endorsed in *Matt*, and we need to apply it consistently.

¶55    I dissent.


                                                          /S/ JAMES C. NELSON



Justice Patricia O. Cotter joins the Dissent of Justice James C. Nelson.



                                                          /S/ PATRICIA COTTER