**FILED**

September 7 2010

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA



DA 09-0430

IN THE SUPREME COURT OF THE STATE OF MONTANA

2010 MT 195

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

ANTHONY SCOTT CHARLIE,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 2008-277
Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Lisa B. Kauffman, Attorney at Law, Missoula, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General, Tammy K. Plubell,
Assistant Attorney General, Helena, Montana

          Fred Van Valkenburg, Missoula County Attorney, Andrew Paul, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  May 25, 2010

Decided:  September 7, 2010

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Appellant Anthony Scott Charlie (Charlie) appeals from his felony conviction of criminal possession of dangerous drugs in the Fourth Judicial District Court. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     On June 7, 2008, Charlie was driving his father's car in Missoula, Montana, with his then-pregnant girlfriend Ronna Elledge (Elledge) in the passenger seat. Officers Sean Lenahan and Rico Suazo of the Missoula City Police Department observed Charlie run a stop sign at the intersection of North Russell and Phillip streets. The officers pulled Charlie over. Officer Suazo made contact with Charlie and informed him why he was being pulled over. Charlie was unable to provide a driver's license, proof of insurance or registration upon request. According to the officers, neither Charlie nor Elledge would make eye contact with them, were speaking rapidly, and seemed very nervous. Officer Suazo claimed that he observed Charlie moving around in his seat and touching items in the middle console. Officer Lenahan claims he observed Elledge attempting to push a white purse beneath the passenger seat. Other patrol vehicles subsequently responded to the scene.

¶3     Officer Suazo ran a status check and found that Elledge had an active, out-of-county warrant for her arrest. The officers also learned that Charlie was currently on probation. The officers sought consent to search the vehicle. Charlie phoned his father to ask him if he would consent to the search, since it was his father's car. His father refused to give consent. The officers subsequently contacted Charlie's probation officer, Officer Andrea Bethal, and described Charlie's behavior and their observations.

2

Officer Bethal authorized a probationary search of the vehicle. Pursuant to the search, officers discovered marijuana in Elledge's purse, baggies of marijuana in a paper bag in the glove box, and various items of paraphernalia. At the time, Elledge told the officers that the marijuana was all hers.

¶4 On June 19, 2008, Charlie was charged with felony criminal possession with intent to distribute and misdemeanor possession of drug paraphernalia. Charlie was appointed assistant public defender Brian Smith (Smith) to represent him. On July 28, 2008, Smith filed a motion to suppress and request for a hearing, arguing the search of the car was illegal. On August 5, 2008, Charlie filed a pro se motion to withdraw the motion to dismiss and remove Smith as his court-appointed counsel. On August 13, the District Court ordered Smith to respond to the motion. On September 19, Smith filed a request for a hearing in order to address Charlie's objection to the motion to suppress. A status conference was held on October 7, and Charlie appeared in open court, again asking the District Court to withdraw the motion to suppress and appoint new counsel. The District Court directed Charlie to put in writing the reasons he would like new counsel, and indicated it would address Charlie's motion on October 14.

¶5 On October 14, Charlie appeared in open court with Smith. Upon Smith's motion, the District Court ordered that Charlie be allowed access to legal reference material in the detention facility, and the District Court set further proceedings for October 28. On that date, Charlie again appeared in open court with Smith, and Smith advised the court that Charlie claimed to have found information to support his legal defense. The District Court then set another status conference for November 18 in order to give Charlie

3

additional time to file a brief. Smith then made a motion for the District Court to order the State to produce any videotapes from the patrol cars involved in the traffic stop. On November 18, Charlie and Smith again appeared in open court. The State advised the court that one of the police vehicles did have a video running, and that the video had been saved. At that time, the District Court indicated that Charlie's case had to go to trial prior to December 19 in order to ensure he received a speedy trial. Smith conferred with Charlie, and then advised the court that Charlie had no objection to temporarily stopping the speedy trial clock until the filing of his amended motion to suppress.

¶6      On December 1, 2008, Smith filed an amended motion to suppress and included a hand-written motion to suppress drafted by Charlie. On December 18, 2008, the District Court held an evidentiary hearing on the motion to suppress. Officers Lenahan, Suazo and Bethel both testified at the hearing. The District Court denied the motion on December 19, 2008, and set the matter for jury trial on January 5, 2009.

¶7      On December 30, 2008, the State produced the in-car videotape from the patrol car driven by Officers Lenahan and Suazo. The video contained evidence of Charlie's arrest which was not previously known to the State or Smith. According to the State, the video had not been properly tagged so that it would be uploaded by the evidence technician, which is why it had not been previously discovered. On December 31, 2008, Smith and the State conferred with Judge Harkin by telephone, without Charlie present since he was incarcerated at the time and not immediately available, to discuss the video in relation to Charlie's upcoming trial. Smith and the State agreed to vacate the January 5 trial date so that Smith would have time to evaluate the impact of the video on Charlie's case. On

4

January 6, 2009, Charlie appeared in District Court with Smith, and Judge Harkin informed him of what had transpired at the December 31 telephonic conference. Judge Harkin explained to Charlie that the video had to be enhanced before it would be viewable and that the individual who could enhance it was not available until January 5. Since the video would not be ready in time, it was decided that Charlie's case could not go to trial as scheduled. Judge Harkin apologized to Charlie for being unable to include him on the phone call, but explained that this matter arose quickly and Charlie was incarcerated. Judge Harkin then asked Charlie if that was acceptable to him, and Charlie responded "Yes." Judge Harkin then stated that "I want him to be up to speed so there's no question about we talked when he wasn't present."

¶8    At that same hearing, Smith then informed the District Court that he was withdrawing from Charlie's case, presumably due to a conflict of interest within the public defender's office, and would be replaced by Lisa Kauffman. Ms. Kauffman was present at the time, and the District Court asked her whether she would be ready for trial next week. She informed the court that she would need 24 hours to let the court know.

¶9    On January 13, 2009, Kauffman appeared in District Court to discuss the status of Charlie's case. She informed the District Court that she would need to review the transcripts of the December 18, 2008 suppression hearing in order to evaluate the impact of the newly-discovered video, but the court reporter informed her that the transcripts would not be ready for at least several weeks. The District Court asked Kauffman how she wanted to handle the situation, and whether she planned to raise speedy trial issues if the trial was delayed. Kauffman stated that she had not yet made a demand for a speedy

5

trial, but was also unwilling to waive Charlie's speedy trial right at that time. In light of the situation presented, the District Court set a status conference for February 17, 2009, to discuss a trial date, thus giving Kauffman an opportunity to review the transcripts of the suppression hearing.

¶10 On February 9, Kauffman filed a motion to dismiss for lack of a speedy trial. At the February 17 status conference the District Court decided to move ahead with a trial date, over Kauffman's objection. On February 18, the clerk set a trial date for March 4, 2009. On February 23, Kauffman received the transcripts of the December 18 suppression hearing. On February 24, the District Court ordered any motions to suppress be filed within 24 hours, and also stated that it would rule on both the speedy trial motion and the motion to suppress before the March 4 trial date. The next day, Kauffman filed a second motion to suppress based on alleged inconsistencies between the testimony at the suppression hearing and the audio portion of the video tape. On February 27, 2009, the State filed an amended information, adding an alternative count of criminal possession of dangerous drugs, a felony in violation of § 45-9-102(6), MCA. Charlie did not object to the new charge. On appeal, Charlie suggests that he did not do so out of concerns that his trial would be delayed further.

¶11 On the morning of the March 4 trial, the District Court issued 2 written orders, denying both Charlie's motion to dismiss for lack of a speedy trial, as well as the second motion to suppress. After a 2-day jury trial, Charlie was acquitted of the original criminal possession with intent to distribute charge and the misdemeanor possession of drug paraphernalia charge, but convicted of the felony criminal possession charge.

6

¶12     On April 1, 2009, Charlie filed a motion for a new trial, arguing that he was entitled to a new trial based on cumulative error, violations of due process, and fundamental fairness.  Charlie's arguments were based primarily on impacts to his trial occasioned by the State's delay in discovering the videotape.  The District Court denied the motion for a new trial on May 8, 2009.  On June 16, 2009, pursuant to the State's motion, the District Court sentenced Charlie as a persistent felony offender.  Charlie was given a 15-year sentence, with 10 years suspended.

¶13     Charlie now timely appeals from his conviction.  We state the issues on appeal as follows:

¶14     **Issue One:** *Did the District Court err in concluding the vehicle search was lawful and denying Charlie's motions to suppress?*

¶15     **Issue Two:** *Did the State's failure to discover the in-car videotape until 6 months after Charlie's arrest violate his right to due process?*

¶16     **Issue Three:** *Was Charlie's absence at the December 31 telephonic conference a violation of his fundamental right to be present at all critical stages of the proceedings against him?*

¶17     **Issue Four:** *Did the District Court err in denying Charlie's motion to dismiss for lack of a speedy trial?*

¶18     **Issue Five:** *Does cumulative error require the reversal of Charlie's conviction?*

¶19     **Issue Six:** *Did the District Court err in sentencing Charlie as a persistent felony offender?*

## STANDARD OF REVIEW

¶20 We review a district court's ruling on a motion to suppress to determine whether its findings of fact are clearly erroneous and its interpretation and application of the law are correct. *State v. Smith*, 2008 MT 7, ¶ 13, 341 Mont. 82, 176 P.3d 258. We review the factual findings in support of a district court's ruling on a speedy trial claim under the clearly erroneous standard. *State v. Hendershot*, 2009 MT 292, ¶ 8, 352 Mont. 271, 216 P.3d 754. However, we review a district court's conclusions of law in the speedy trial context de novo, in order to determine whether the district court correctly interpreted and applied the law. *Hendershot*, ¶ 8.

¶21 We exercise plenary review over constitutional questions, including alleged violations of a criminal defendant's right to be present at critical stages of the proceedings against him. *State v. Berosik*, 2009 MT 260, ¶ 27, 352 Mont. 16, 214 P.3d 776. Alleged violations of due process also involve questions of constitutional law over which we exercise plenary review. *State v. Finley*, 2003 MT 239, ¶ 10, 317 Mont. 268, 77 P.3d 193.

¶22 We review criminal sentences which include at least 1 year of actual incarceration for legality. *State v. Anderson*, 2009 MT 39, ¶ 7, 349 Mont. 245, 203 P.3d 764. "Our review is confined to determining whether the sentencing court had statutory authority to impose the sentence, whether the sentence falls within the parameters set by the applicable sentencing statutes, and whether the court adhered to the affirmative mandates of the applicable sentencing statutes." *Anderson*, ¶ 7.

¶23 **Issue One:** *Did the District Court err in concluding the vehicle search was lawful and denying Charlie's motions to suppress?*

8

¶24   At the time of the June 7, 2008 traffic stop, Charlie was on probation. As a standard condition of his probation, Charlie was required to submit to a search of his person, vehicle or residence upon reasonable cause by a probation or parole officer at any time without a warrant. *State v. Burchett*, 277 Mont. 192, 195, 921 P.2d 854, 856 (1996); *see also* Admin. R. M. § 20.7.1101(7) (2010). As the Court stated in *Burchett*, "[t]he 'reasonable cause' standard is substantially less than the probable cause standard required by the Fourth Amendment because of the probationer's diminished expectation of privacy and because the probation officer is in the best position to determine what level of supervision is necessary to provide both rehabilitation of the probationer and safety for society." *Burchett*, 277 Mont. at 195-96, 921 P.2d at 856 (citing *State v. Burke*, 235 Mont. 165, 169, 171, 766 P.2d 254, 256-57 (1988)).

¶25   Charlie contends that the officers lacked reasonable cause to search the car. At the December 18, 2008 suppression hearing, Officers Lenahan and Suazo both testified. The officers told the District Court that Charlie and Elledge were nervous, spoke rapidly, failed to make eye contact, and appeared to be reaching around the vehicle when stopped. Officer Lenahan also told the District Court that he had Charlie get out of the car for safety concerns. However, Charlie contends that the videotape, which was discovered after the suppression hearing, contains evidence demonstrating that these safety concerns were "hogwash." On the videotape, Charlie contends that Officer Lenahan explicitly told Officer Suazo that he wanted to get Charlie out of the car in order to gain his consent for a search, and not for safety reasons. Charlie further contends that the videotape shows that he was not in fact nervous during the stop, and responded to the officers' questions in

9

a calm and helpful manner. Additionally, Charlie contends that when Officer Suazo testified, he indicated that it was Elledge, not Charlie, who was actually nervous during the stop.

¶26    At the suppression hearing, Officer Lenahan testified about his conversation with Charlie's probation officer, Officer Bethal. When questioned, Officer Lenahan stated that Officer Bethal indicated she had a lengthy history of supervision with Charlie, and that she wanted the officers to conduct a probation search. Charlie argues, however, that Officer Bethal had only a short history of supervision with Charlie, and had only met with him 4 times prior to the date of the search. Charlie claims Officer Bethal conceded during the suppression hearing that she was authorizing the search based on Officer Lenahan's description of Charlie's nervousness, and that she would not have authorized a search based solely on the running of the stop sign. Charlie contends that Officer Bethal improperly relied on the information relayed by Officer Lenahan in authorizing the search, and unwittingly joined him in using the probation search as a basis for harassment and intimidation. Charlie also challenges Officer Lenahan's credibility on the issue on the late appearance of the patrol car videotape. At the hearing, Officer Lenahan testified that the videotape equipment was not working at the time of the stop. Charlie argues that subsequent events demonstrated this was not true, putting Officer Lenahan's credibility in question. For these reasons, Charlie contends the probationary search was unlawful and the District Court erred in denying the motion to suppress.[1]

_____

[1] In this connection, we take note of the fact that the District Court did review the contents of the videotape in its consideration of Charlie's second motion to suppress. The District Court

10

¶27 The State argues the District Court did not err. The State notes that the District Court explicitly concluded in its order on the motion to suppress that Officers Lenahan and Suazo were credible witnesses. The State points out that during the suppression hearing, Officer Lenahan testified that he could have been mistaken about the existence of the videotape, since as a patrol officer he does not have access to the cataloging system for the videotapes; instead, the videotapes are under the control of the shift lieutenants and handled by the employees in the information technology department. Further, the State notes that Officer Lenahan did testify that officer safety was a concern, and the videotape supports this observation by showing the careful manner in which the officers monitored the vehicle, as well as the fact that they did not turn their backs on the vehicle when walking away from the car.

¶28 The State also argues that the officers testified in detail about Charlie's behaviors based upon their training and experience, and that their testimony was adopted as credible by the District Court in its findings. The State contends that Officer Suazo's testimony was not inconsistent with that of Officer Lenahan, and that he too testified that both Charlie and Elledge appeared nervous, had difficulty maintaining eye contact, and appeared to be reaching around inside the car.

¶29 Finally, the State disputes Charlie's claims that Officer Lenahan was less than truthful when he testified about his conservation with Officer Bethal. Officer Bethal

_____

concluded, however, that the videotape did not shed any additional light on the matter because the video did not clearly show what was transpiring in the defendant's car at the time of the stop or his actions and mannerisms. The District Court concluded that the video was of such a poor quality in this regard that it could not support any additional factual findings.

testified that prior to supervising Charlie directly her partner supervised Charlie for 2 years, and that she was acquainted with Charlie prior to the stop. In sum, the State argues that Charlie's challenge to the District Court's ruling is largely an attempt to overturn its credibility determinations, and that this Court should not disturb them in this case.

¶30 To the extent that Charlie asks this Court to re-weigh the credibility of the officers, we decline the invitation to do so. The State correctly notes that credibility determinations are largely left to the sound discretion of the trier of fact. *See State v. Bomar*, 2008 MT 91, ¶ 23, 342 Mont. 281, 182 P.3d 47. However, Charlie may challenge the factual findings of the District Court under the clearly erroneous standard. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or if a review of the record leaves the Court with a definite or firm conviction that a mistake has been made. *State v. Munson*, 2007 MT 222, ¶ 18, 339 Mont. 68, 169 P.3d 364.

¶31 We conclude that Charlie has failed to demonstrate that the District Court's findings on this matter were clearly erroneous, or that its interpretation and application of the law was incorrect. The District Court did not err in concluding the probationary search of the vehicle was lawful and in denying Charlie's motion to suppress.

¶32 **Issue Two:** *Did the State's failure to discover the in-car videotape until 6 months after Charlie's arrest violate his right to due process?*

¶33 Charlie argues that the State's failure to account for the videotape until roughly 6 months after his arrest constitutes a violation of his rights to due process. Charlie argues that the late discovery of the videotape demonstrates that the State failed to make

reasonable efforts to gather this evidence, and that this failure violates the State's duty to gather evidence under Article II, Section 17 of the Montana Constitution. Charlie acknowledges that in *State v. Giddings*, 2009 MT 61, 349 Mont. 347, 208 P.3d 363, this Court held that failure to divulge potentially exculpatory evidence will result in a due process violation only if the defendant can establish the State acted in bad faith in its handling of the evidence. *See Giddings*, ¶¶ 47-48. While Charlie concedes that *Giddings* properly articulates Montana's "bad faith" standard based upon a federal law analysis, he argues that this Court should adopt a more stringent test for a defendant's access to evidence based upon the Montana Constitution.

¶34 In response, the State argues that the current iteration of Charlie's due process argument was not raised before the District Court, and should not be considered by this Court for the first time on appeal. Second, the State points out that the explanation given at the hearing for the late discovery of the videotape was that there was a glitch in the new system of the Missoula Police Department during a technology upgrade which caused the videotape to go undetected. Once the videotape was discovered, it was promptly turned over to Charlie's counsel. Charlie's counsel was then given the opportunity to review the tape. The State contends that the fact that it would have been preferable for the State to have discovered the tape sooner simply does not equate to a due process violation under these circumstances.

¶35 We agree with the State that the due process argument as currently framed by Charlie was not presented to the District Court. Thus, we decline to reach the argument as to whether Article II, Section 17 of the Montana Constitution imposes greater duties

on the State with respect to the handling of evidence.  *See Hendershot*, ¶ 31 (stating that a party may not raise new arguments or change its legal theory on appeal because it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider.).  Furthermore, we agree with the State that Charlie has failed to demonstrate that the late discovery of the videotape, in and of itself, constituted a violation of his right to due process.  The State has provided an explanation for the delay in producing the videotape, and there is no evidence in this record that this explanation is untrue or otherwise questionable.  Accordingly, we deny Charlie's claimed due process violation in this regard.

¶36  **Issue Three:** *Was Charlie's absence at the December 31 telephonic conference a violation of his fundamental right to be present at all critical stages of the proceedings against him?*

¶37  Charlie argues that the December 31 telephonic conference constituted a critical stage of the proceedings against him, that he was entitled to be present at this proceeding under Article II, Section 24 of the Montana Constitution, and that his exclusion from the conference so contaminated the framework of the trial that it resulted in a violation of his right to fundamental fairness.  Under *State v. Matt*, 2008 MT 444, 347 Mont. 530, 199 P.3d 244, Charlie argues that a "critical stage" is any step of the proceedings where there is potential for substantial prejudice to the defendant.  *Matt*, ¶ 17.  Charlie argues that his absence from the telephonic conference deprived him of the opportunity to review the newly-discovered videotape before discussions were made regarding new trial dates, or before deciding whether to accept a plea agreement, exercise his right to proceed pro se, or utilize Smith as stand-by counsel.  He argues that he was forced to choose between

14

waiving his right to a speedy trial and giving his lawyers adequate time to prepare for his defense. Charlie argues that his argument in this regard is supported by *State v. Mann*, 2006 MT 160, 332 Mont. 476, 139 P.3d 159.

¶38 In response, the State argues that Charlie's arguments about proceeding pro se or accepting the withdrawal of his counsel are misplaced, because the substitution and withdrawal of counsel was not discussed at the December 31 telephonic conference, but instead at the hearing on January 6. The State further contends that even if the telephonic conference was deemed a critical stage in the proceedings, Charlie's argument must fail since he cannot demonstrate that his lack of participation in the telephonic conference caused him any prejudice, as the only topic discussed at the meeting was the impact of the newly-discovered videotape on the proceedings. The State argues it is inconceivable that, had Charlie been present, he would have preferred that his attorney not examine the videotape and instead proceed to trial the following week as scheduled. The State argues that if Charlie's counsel had in fact taken such action, the Court would likely be considering an ineffective assistance of counsel claim.

¶39 When Charlie appeared in District Court on January 6, the District Court informed Charlie about what happened, and also held out a possible trial date for the following week. However, Charlie's new counsel, Kauffman, believed the trial date needed to be postponed in order to adequately review the videotape in relation to the suppression hearing and previous court ruling. Furthermore, it was a review of the videotape right before the January 6 hearing that led Smith to conclude that the public defender's office had a conflict of interest causing him to withdraw and prompted the District Court to

15

appoint contract counsel to handle the case. For these reasons, the State argues that the postponement of the trial was done to protect Charlie's rights, and that *Mann* in fact demonstrates why Charlie was not prejudiced by his absence from the telephonic conference.

¶40 The United States and Montana Constitutions both guarantee a defendant the right to be present at all critical stages of the criminal proceedings against him. *Matt*, ¶¶ 16-17. As we stated in *Matt*, "[a] defendant has 'a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.' " *Matt*, ¶ 16 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987)). A "critical stage" is considered to be "any step of the proceeding where there is potential for substantial prejudice to the defendant." *Matt*, ¶ 17 (citation omitted). We went on in *Matt* to hold that if a defendant is excluded from a critical stage in the proceedings, the prejudice against the defendant is presumed and the State bears the burden of proving the prejudice was harmless. We further held that if the violation constitutes a "structural defect," the presumption of prejudice is conclusive. *Matt*, ¶ 38. Structural defects are constitutional violations which so infect and contaminate the framework of a trial as to render it fundamentally unfair, requiring automatic reversal. *Matt*, ¶ 32. Under the harmless error analysis, by contrast, the burden is on the State to demonstrate that there is no "reasonable possibility" that the violation of the defendant's right to be present caused him prejudice. *Matt*, ¶ 35.

¶41 Because the parties present at the telephonic conference in this case discussed the impact of the newly-discovered videotape on Charlie's trial, we conclude Charlie's presence at that conference had a reasonably substantial relation to his right to defend against the charges. Accordingly, we conclude that it was a critical stage of the criminal proceedings against him. We further conclude that Charlie's absence from the proceedings was not structural in nature, and should be considered under the harmless error analysis. Therefore, the question presented is whether there is a "reasonable possibility" that Charlie's absence from the telephonic conference caused him prejudice.

¶42 In *Matt*, we held that prejudice to a defendant is presumed if he is excluded from a critical stage of the proceedings against him. We then shifted to the State "the burden to rebut the presumption by demonstrating there is no reasonable possibility the violation prejudiced the defendant in light of the interests the right of presence was designed to protect." *Matt*, ¶ 38. In *State v. Price*, 2009 MT 129, 350 Mont. 272, 207 P.3d 298, a plurality of this Court observed that prior to *Matt*, this Court had not required the State to satisfy such a burden. *Price*, ¶ 32. Based on this observation and § 46-20-701, MCA, the plurality opined that we should impose no burden upon the State; rather, we should "simply examine[] the record to determine whether the violation caused the defendant to suffer prejudice." *Price*, ¶ 32. Because the Court's Opinion with respect to this issue was endorsed by only a plurality of three Justices rather than a majority of the Court, however, its conclusion in this regard does not constitute binding precedent on this point. *See CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 81, 107 S. Ct. 1637, 1645 (1987).

17

¶43 Nonetheless, we take this opportunity to revisit our decision in *Matt,* reconcile *Matt* and *Price,* and clarify the process to be utilized when it is determined—as here—that the defendant was excluded from a critical stage of the proceedings. First, it bears noting that, in *Matt,* we did not impose a "burden of proof" per se, although the opinion has been interpreted to impose such a burden. *Price,* ¶ 32. Rather, we imposed on the State the burden to rebut a presumption of prejudice to the defendant. *Matt,* ¶ 38. The plurality in *Price,* expressing its dissatisfaction with *Matt,* maintained that the "harmless error" statute, § 46-20-701, MCA, does not expressly place a burden of proof on either party. *Price,* ¶ 32.

¶44 A party's burden to prove a disputed issue or charge generally occurs at the trial level and not on appeal where the parties are confined to matters of record. *Anderson v. Stokes*, 2007 MT 166, ¶ 57, 338 Mont. 118, 163 P.3d 1273. Thus, to argue that a party bears a "burden of proof" at the appellate level is semantically inaccurate. Nonetheless, once it is established that the defendant was excluded from a critical stage of the proceedings, the burden to demonstrate whether the error was harmless *must* fall somewhere; otherwise, we run the risk that neither party will make a showing, resulting in potentially ad hoc and arbitrary analyses in each case in which such an error is considered.

¶45 The United States Supreme Court has held that a harmless error analysis turns on the notion that "the burden [is] on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). While we acknowledge that the

18

State is not generally responsible for the exclusion of the defendant from critical stages of a proceeding, it will *ipso facto* be the State as the prevailing party in an appeal of this nature who has "benefitted" from the error. Therefore, so as to ensure that the error of exclusion is properly reviewed under federal and state constitutional principles, and that the burden is assigned uniformly in every case, we reaffirm our holding in *Matt* that it shall be incumbent on the State to demonstrate that there is no reasonable possibility that the violation prejudiced the defendant; in other words, the State will carry the burden of *persuading* the Court, based upon the record before us and given the interests the right of presence was designed to protect, that the violation was harmless. Because the State will carry this burden, however, we deem it unnecessary to commence the inquiry with a presumption of prejudice in those instances where the exclusion of the defendant from the proceedings does not constitute a structural defect. Instead, we will simply impose the burden of persuasion on the State, as herein set forth. To the limited extent that *Matt* imposed a presumption of prejudice where the defendant is excluded from a critical stage of the proceedings in matters of non-structural error, it is overruled. *Matt*, ¶ 38.

¶46 We now apply the foregoing analysis to the instant case. At the time of the telephonic conference, Charlie's trial date was approximately 1 week away, and the videotape had not yet been enhanced. We agree with the State, that had Charlie been involved in the conversation and insisted on going to trial without viewing the videotape, the Court would likely be presented with an ineffective assistance of counsel claim. Indeed, Charlie claims repeatedly that a review of this videotape was critical to his case. By postponing the trial date in order to ensure that Charlie's counsel had time to review

19

the videotape, the District Court and all parties were acting to protect Charlie's right to a fair trial.

¶47 Additionally, the District Court presented Charlie with an opportunity to commence his trial the following week when he appeared at the January 6 hearing. Thus, if Charlie truly disagreed with the decision to postpone the trial and review the videotape, he could have insisted on having a trial and foregoing the opportunity to view the videotape. Under these circumstances, the State has persuaded us that there is no reasonable possibility that Charlie's absence from the December 31 telephonic conference caused him prejudice, and that his exclusion constituted harmless error.

¶48 **Issue Four:** *Did the District Court err in denying Charlie's motion to dismiss for lack of a speedy trial?*

¶49 On March 4, 2009, the District Court denied Charlie's motion to dismiss for lack of a speedy trial. In its written order, the District Court reviewed the procedural history of the case as noted above, *Opinion*, ¶¶ 4-11, and reviewed the 4-factor speedy trial analysis as set forth in *State v. Ariegwe*, 2007 MT 204, 338 Mont. 442, 167 P.3d 815. In *State v. Billman*, 2008 MT 326, 346 Mont. 118, 194 P.3d 58, we summarized this test as follows:

> We consider four factors when presented with a speedy trial claim: the length of the delay, the reasons for the delay, the accused's responses to the delay, and prejudice to the accused. *Ariegwe*, ¶¶ 106-111. We then balance the four speedy trial factors to determine whether the accused has been denied the speedy trial right. *Ariegwe*, ¶ 112. Each factor's significance varies based on the particular case's unique facts and circumstances. *Ariegwe*, ¶ 105.

*Billman*, ¶ 11.

20

¶50 Pursuant to factor 1, the district court first determines the length of the delay between accusation and date of trial, or the final disposition of the case. *Hendershot*, ¶ 10. The District Court found that Charlie became an accused on June 7, 2008, and that his trial date was on March 4, 2009. The "trigger date" for a speedy trial analysis is any length in delay over 200 days. If the trigger date is met, factor 1 of the *Ariegwe* analysis requires the court to determine the extent of delay beyond the trigger date. *Hendershot*, ¶ 10. The total delay in Charlie's case was 270 days, 70 days beyond the trigger date. In Montana's speedy trial analysis, "[w]e presume that the accused has experienced some prejudice once the 200-day threshold passes. That prejudice intensifies as the delay extends beyond the 200-day trigger date, and the State's burden to justify the delay increases." *Billman*, ¶ 18 (citing *Ariegwe*, ¶¶ 56, 62). Because the delay was only 70 days past the 200-day trigger date, the District Court concluded that the State did not have to show a particularly compelling justification for the delay.

¶51 Under factor 2, "the District Court [is] then required to identify each period of delay in bringing the accused to trial, attribute each period of delay to either the State or [the defendant], and then assign appropriate weight to each period of delay based on specific cause and culpability." *Hendershot*, ¶ 11 (citing *Ariegwe*, ¶ 124). The District Court first considered the length of time from the date of the original accusation (June 7, 2008) to the original trial date of January 5, 2009—a total period of 213 days. The District Court attributed the first 72 days of this time, from June 7 to August 18, as institutional delay against the State. However, after an August 18 deadline for filing motions, Charlie filed several pretrial motions. Of the period from August 18 to January

21

5, a total of 140 days, the District Court attributed 87 days to Charlie based on the late filing of motions and requests for hearings, and 53 days to the State. Of the State's 53 days, 4 were considered intentional delay, while 49 days were considered institutional. In sum, for the period from Charlie's accusation to the original trial date, 87 days were attributed to Charlie, while 125 days were attributable to the State. Of the State's portion of the delay, 4 days were considered "intentional" and 121 days were institutional.

¶52   The District Court then considered the time period from January 5 to March 4, 2009, a total of 58 days. The District Court attributed 34 days of delay to Charlie, based on his request for new counsel and the fact that his new counsel had to familiarize herself with the earlier suppression hearing proceedings and videotape. The remaining 24 days were then attributable to the State. Of this delay, 9 were considered due to the State's lack of diligence and negligence based on the State's inability to produce the video upon request, while 15 were considered institutional. Thus, of the total 270 days of delay, 121 were attributable to Charlie, and 149 were attributed to the State. Of the State's share, 136 days were institutional, 4 were intentional, and 9 were due to negligence or lack of due diligence.

¶53   In weighing factor 2, the District Court noted the "gradations of culpability" recognized by this Court in *Ariegwe*. Unintentional or institutional delays caused by circumstances beyond the control of the prosecutor, such as overcrowded court dockets or understaffed prosecutors, weigh less heavily against the State. *Ariegwe*, ¶¶ 67-68. While negligence in bringing a defendant to trial occupies a "middle ground," this Court nonetheless treats negligence as an unacceptable reason for the delay. *Ariegwe*, ¶ 69.

22

Because the District Court concluded that the State does not have to show a particularly compelling justification for the delay in Charlie's case, and because the vast majority of overall delay was either institutional or attributable to Charlie, the District Court concluded that factor 2 weighed slightly against the conclusion that Charlie was deprived of his right to a speedy trial.

¶54 Under factor 3, the court considers the accused's responses to the delay. *State v. Rose*, 2009 MT 4, ¶ 60, 348 Mont. 291, 202 P.3d 749. This analysis is "based on surrounding circumstances, such as timeliness, persistence and sincerity of any objection to the delay, the reasons for any acquiescence in delay, and [the defendant's] pretrial conduct (as that conduct bears on the speedy trial right). Conduct evidencing a desire to be brought to trial promptly weighs in [the defendant's] favor whereas conduct demonstrating a desire to avoid trial weighs against [the defendant] in the overall balancing." *Rose*, ¶ 60 (citing *Ariegwe*, ¶¶ 79-81, 85). The District Court noted that Charlie did not object to the State having until December 12, 2008, to respond to his amended motion to suppress. Further, at the January 13, 2009 status hearing, while Charlie did not waive his right to a speedy trial, he did not affirmatively make a demand for a speedy trial at that time either. Charlie did not raise his speedy trial claim until the filing of his motion on February 9, 2009. Accordingly, the District Court concluded this factor weighed slightly against finding a speedy trial violation, but also concluded this factor would have little weight in the overall speedy trial analysis.

¶55 Under factor 4, the court considers whether the defendant had been prejudiced by the delay. *Hendershot*, ¶ 14. The District Court noted that once the 200-day trigger is

23

exceeded, some degree of prejudice is presumed. *Ariegwe*, ¶ 56. Based on its previous analysis, however, the District Court noted that there was only a slight presumption that the pretrial delay in this case caused Charlie prejudice, and that Charlie was still required to make a highly persuasive showing that he was prejudiced by the delay. As we stated in *Hendershot*, "prejudice to the accused [is] to be evaluated in light of the following interests which the right to a speedy trial was designed to guard against: (1) oppressive pretrial incarceration; (2) the accused's anxiety and concern; and (3) the possibility that the defense will be impaired by dimming memories and loss of exculpatory evidence." *Hendershot*, ¶ 14.

¶56 The District Court found that Charlie had not suffered oppressive pretrial incarceration in this case. The District Court noted that Charlie was incarcerated for the entire 270-day period, but that this was due to the fact that he was on conditional release with the Department of Corrections at the time he was arrested, and will remain an inmate on his prior felony conviction until 2010. While Charlie alleged that he could have been eligible for early release programs had he not been arrested, the District Court noted that Charlie had nevertheless failed to present any allegations that the conditions of his incarceration were oppressive. Regarding the second interest—minimizing anxiety and concern caused by the unresolved charges—the District Court noted Charlie did allege he had great reason to be filled with anxiety and concern due to the new charges and increased sentences, and that his ability to earn a living and visit or support his children had been disrupted. However, the District Court determined that these issues were more attributable to the fact that he had been charged with additional crimes and

24

that his conditional release had been revoked, rather than any delay in commencing trial. With regard to the impairment of defense interest, the District Court determined that Charlie failed to allege any impairment in his ability to present a defense due to the delay, or that the length of the delay was so egregious that it compromised the reliability of Charlie's trial. Accordingly, the District Court determined that factor 4 weighed rather heavily against the conclusion that Charlie was deprived of his right to a speedy trial.

¶57 In weighing these factors together, the District Court concluded that only factor 1 weighed in Charlie's favor, while the remaining factors weighed against the conclusion that Charlie was deprived of his right to a speedy trial. Accordingly, the District Court concluded that Charlie's right to a speedy trial had not been violated.

¶58 Charlie argues the District Court erred in concluding that his right to a speedy trial had not been violated in this case. With regards to factors 1 and 2, Charlie generally argues that "most" of the pretrial delay should be attributed to the State in this case, and that the State's failure to account for the videotape until 6 months after his arrest should weigh heavily against the State. Under factor 3, Charlie generally argues that he tried "aggressively" to get his case to trial but was handcuffed at every turn by missing evidence or disputes with his lawyer, and that he had to get a court order permitting him access to the jail's law library so he could assist in his defense. Under factor 4, Charlie repeats that he would have been eligible for an early release program had he not been incarcerated, and also alleges that he suffered anxiety since he was not permitted to visit his family or claim a paternity interest in the child born to Elledge while he was

incarcerated. He also alleges that his defense was generally impaired by the State's negligence in producing the videotape.

¶59 The findings of fact in support of a district court's ruling on a motion for a speedy trial are reviewed under the clearly erroneous standard and its conclusions of law are reviewed de novo for correctness. *Hendershot*, ¶ 8. We conclude that Charlie has failed to demonstrate that the District Court's findings were clearly erroneous or that its conclusions of law were incorrect. We agree with Charlie that the State's delay in producing the videotape clearly constituted negligence which is not an acceptable basis for delaying a trial. However, even if the entire delay occasioned by the late discovery of the videotape were attributed to the State, it would not alter the conclusion that Charlie's right to a speedy trial was not in fact violated. If all of this delay was attributed to the State, it would add an extra 34 days to the State's portion of the delay, and remove the same from Charlie. Under factor 2, the total delay attributed to the State would be 183 days, and 87 would be attributable to Charlie. Of the State's portion then, 121 days would be institutional, 4 would be intentional, and 58 would be due to negligence, which occupies a "middle ground" in terms of gradations of culpability. This change would affect the analysis by tipping factor 2 more favorably in Charlie's favor, but not to a great degree, given the fact that the vast majority of the State's delay would still be due to institutional reasons. Moreover, this alteration would not change the analysis under factor 1 because the overall length of the delay (i.e., 70 days past the 200-day trigger date) would remain the same; nor would it increase the burden on the State or require it to provide a particularly compelling justification for the delay. Furthermore, this change

26

would not affect in any way the District Court's analysis under factors 3 and 4. In sum, weighing factor 2 in Charlie's favor due to the State's negligence in producing the videotape would not change the ultimate result under the *Ariegwe* analysis. For these reasons, therefore, we conclude the District Court did not err in denying Charlie's motion to dismiss for lack of a speedy trial.

¶60 **Issue Five:** *Does cumulative error require the reversal of Charlie's conviction?*

¶61 Charlie argues that cumulative error in the proceedings against him prejudiced his right to a fair trial and requires that his conviction be reversed. Charlie contends that he was deprived of material evidence due to police negligence or misconduct, and thereby denied due process. We see no merit to Charlie's claim, especially given the fact that the State produced the videotape once it was discovered in its system. While there was a delay in the proceedings against Charlie due to the State's failure to produce the videotape until roughly 6 months after his arrest, the delay was also occasioned by other factors noted above. Under these circumstances, we decline to find cumulative error.

¶62 **Issue Six:** *Did the District Court err in sentencing Charlie as a persistent felony offender?*

¶63 The District Court sentenced Charlie as a persistent felony offender (PFO). The statute under which Charlie was sentenced reads in pertinent part as follows:

> A "persistent felony offender" is an offender who has previously been convicted of a felony and who is presently being sentenced for a second felony committed on a different occasion than the first. An offender is considered to have been previously convicted of a felony if:
>     (1) the previous felony conviction was for an offense committed in this state or any other jurisdiction for which a sentence to a term of imprisonment in excess of 1 year could have been imposed;

27

(2) less than 5 years have elapsed between the commission of the present offense and either:

(a) the previous felony conviction; or

(b) the offender's release on parole or otherwise from prison or other commitment imposed as a result of the previous felony conviction . . . .

Section 46-18-501, MCA.

¶64    Charlie had been previously convicted of felony possession of a deadly weapon by an inmate on August 16, 2001. Charlie was discharged from prison and began serving his suspended sentence on October 1, 2003. His current offense was committed on June 8, 2008. Under § 46-18-501(2)(b), MCA, Charlie is a PFO because fewer than 5 years have elapsed between his release from prison and his current offense. *See State v. Montoya*, 1999 MT 180, ¶ 26, 295 Mont. 288, 983 P.2d 937 (stating "that 'release on parole or otherwise from prison or other commitment,' § 46-18-501(2)(b), MCA, triggers the commencement of the statutory five-year period, irrespective of whether the prior felony conviction occurred more than five years in the past."). Charlie's sentencing as a PFO was within statutory parameters and constitutes a legal sentence.

## CONCLUSION

¶65    For the foregoing reasons, Charlie's conviction is affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS